The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MELISSA M. BRYANT, individually, and the
ESTATE OF JEFFREY J. BRYANT, deceased,
by and through Melissa M. Bryant, its Personal
Representative,

        Plaintiffs,

    vs.

COUNTRY LIFE INSURANCE
COMPANY, an Illinois corporation,

        Defendant.

CASE NO. C04-2429C

ORDER

I.      INTRODUCTION

      This matter has come before the Court on Plaintiffs' partial motions for summary judgment (Dkt. Nos. 33, 34) and Defendant's motion for summary judgment (Dkt. No. 27).  Having carefully considered the papers filed by the parties, the Court has determined that no oral argument shall be necessary.  For the reasons that follow, the Court hereby GRANTS in part and DENIES in part Defendant's motion and GRANTS in part and DENIES in part Plaintiffs' motions.

II.     BACKGROUND

      Plaintiff Melissa Bryant brought this action on behalf of herself and her deceased husband, Jeffrey Bryant, in part to recover benefits alleged to be due under life insurance policies issued by Defendant.  Mr.

Bryant was employed as a "Trainee Agent" at an insurance sales office that was an affiliate of Defendant Country Life. Under the terms of the "Trainee Agent Agreement" Mr. Bryant entered into with his employer, CC Services, Inc., he was authorized to sell Country Life insurance policies. During the course of his employment, Mr. Bryant acted as the insurance agent in the sale of two Country Life policies to himself. The parties disagree as to whether the third application/policy should be considered "sold."

The two policies on whose issuance the parties have no dispute are a $50,000 term life policy ("312 policy") and a $50,000 whole life policy ("311 policy"). Mr. Bryant applied for both of these policies on December 20, 2002. At the time he submitted the applications, he also issued himself two binding receipts that provided a smaller amount of insurance during the period of time when the applications were under review.

On his applications, Mr. Bryant disclosed that he was five feet, nine inches tall, weighed 235 pounds (Barnum Decl. 19, 29), had a nose disorder, and suffered from asthma and high blood pressure (*id.* 21, 31). He also disclosed that he had previously undergone a bilateral ethmoidectomy.[1] (*Id.*) Mr. Bryant signed an authorization form permitting Country Life to obtain his medical records.

On January 28, 2003, Country Life responded to Mr. Bryant regarding both policies, stating, "we have issued th[ese] polic[ies] differently than applied for due to height/weight on examination and medical history of asthma." (*Id.* 27, 37.) No note was made of Mr. Bryant's ethmoidectomy. Mr. Bryant accepted the policies as changed, or "rated up" by Country Life and the policies went into effect on February 26, 2003.

On October 10, 2003, Mr. Bryant underwent another bilateral ethmoidectomy. The surgery appeared to have been uneventful, and Mr. Bryant was released to go home that same afternoon. However, the next morning, having woken with a severe headache, Mr. Bryant was taken by his wife to the Yakima Valley Memorial Hospital emergency room. Mr. Bryant died later that evening.

---

[1] An ethmoidectomy is a kind of sinus surgery.

Based on the autopsy report, it appears that Mr. Bryant died of meningitis. (Marisseau Decl. 15–19.) Mrs. Bryant has filed a complaint against Mr. Bryant's ethmoidectomy surgeon, alleging that Mr. Bryant's fatal meningitis and sepsis resulted from the surgery. (Marisseau Decl. 31.)

On October 13, 2003, Ms. Janet Richardson, the manager of the CC Services office where Mr. Bryant worked, learned that Mr. Bryant had died over the weekend. (Richardson Decl. ¶ 2.) Upon arriving at the office, Ms. Richardson was told by "one or more of the employees in the office" that an application for a life insurance policy had been found on Mr. Bryant's desk. Ms. Richardson called Country Life's home office to ask what she should do with the application and was told that she should fax the application to Mr. Tom Harris. On October 14, 2003, Ms. Richardson faxed Mr. Bryant's application, including a check Mr. Bryant had left with the application, to Mr. Harris. The fax also included the binding receipt usually issued with these applications. (Richardson Decl. 11.) However, Mrs. Bryant was later provided with the original copy of the binding receipt. By the time the original copy of the application was sent to Country Life in December 18, 2003, the binding receipt had been removed. (Darner Decl. 14–32 (containing original application and reflecting that the binding receipt had been removed).) This application was assigned a number and will be referred to as the 840 application.

When Mr. Harris received the faxed application, he gave it to Mr. Mark Barnum, the Chief Underwriter for Life and Health Insurance at Country Life. Mr. Barnum testified at his deposition that he "was told to underwrite it." (Barnum Dep. 169:20–170:3; *see also* Barnum Decl. ¶ 21 (stating "I opened a new file for the application to evaluate whether the company would accept it").)

In the process of evaluating the application or underwriting the policy, Country Life generated two "Underwriting/Issue Worksheets". (Samuelson Decl. Exs. R, T.) The first, printed on October 15, 2003, reflects that Country Life had at least begun to calculate applicable premiums and assign a policy number (801) and that it considered the application date and policy date to be October 10, 2003. The second,

printed on October 17, 2003, contained the same information as above, but also contained the notation "PSTPNED TIL RELEASD FROM DR." (Samuelson Decl. Ex. T.)

On October 21, 2003, the Country Life underwriting department received an "Amplified Life Inspection Report 213" reflecting that "THE SECRETARY AT THE BUSINESS STATED THE APPLICANT PASSED AWAY ON 10/11/03." (Samuelson Decl. Ex. U.) The same day, Mr. Barnum arranged to have a form letter sent to Mr. Bryant indicating that Country Life was unable to provide the insurance protection applied for "because surgery needs to be completed and released from doctor's care [*sic*]." (Barnum Decl. 18.) Mr. Barnum stated that although he knew at the time he arranged to have the letter sent to Mr. Bryant at his home address that Mr. Bryant had already died, he wanted to ensure that this case was treated in the same way as "all other similar applications." (Barnum Decl. ¶ 30.) Mr. Barnum also noted in his declaration that "Most importantly, life insurance cannot be issued to people who have already died." (Barnum Decl. ¶ 30.)

On October 23, 2003, Country Life received a death claim filed by Mrs. Bryant with the assistance of agent Glenn Siron pursuant to the 311 and 312 policies. (Samuelson Decl. Ex. Y.) The claim stated that Mrs. Bryant sought accidental death benefits. (*Id.*) The claim papers included a death certificate issued by the Yakima County coroner, stating that the immediate cause of Mr. Bryant's death had been "cardiac dysrhythmia & cerebral edema (brain dead)". (*Id.*)

After receipt of Mrs. Bryant's claim, Country Life obtained copies of the pre-operative exam sheet prepared by Dr. Schefter, the doctor who performed the ethmoidectomy, and the Yakima Valley Memorial Hospital's records pertaining to its treatment of Mr. Bryant upon his admission to the emergency room. (Darner Decl. 39–55.)

On December 8, 2003, Country Life paid the face amount of both policies, plus interest, amounting to a payment of $101,348.17, but did not pay the accidental death benefit because its life claims examiner,

Ms. Kim Cordts, had classified his death as being due to natural causes.  (Samuelson Decl. Ex. AA.)

One week later, Country Life sent Mrs. Bryant a letter stating, "We are informed Mr. Bryant completed an additional application for life insurance shortly before his death.  We have established a claim file for review of any additional coverage that may be due as a result of this application." (Samuelson Decl. Ex. CC.)   On December 17, 2003, Mrs. Bryant's attorney sent a letter to Country Life claiming payment of the entire proceeds and all benefits of the policy associated with the 840 application and citing the binding receipt.  Country Life interpreted the demand as applying only to the binding receipt.  Country Life responded to the demand on January 13, 2004, disclaiming liability under the binding receipt on the grounds that the receipt was void or voidable because Mr. Bryant had acted as both the agent and the applicant.  (Darner Decl. 8–9.)

Mrs. Bryant filed this action on her own behalf and in her capacity as the personal representative of Mr. Bryant's estate.  The complaint alleges six causes of action, (1) breach of contract, (2) bad faith and breach of fiduciary duty, (3) misrepresentation, (4) Consumer Protection Act violations, (5) declaratory relief, and (6) intentional infliction of emotional distress, and seeks to recover $50,000 under the accidental death provision of the 311 policy, $200,000 under the binding receipt associated with the 840 application and $1,000,000 under the 801 policy (associated with the 840 application).  Defendant's motion for summary judgment seeks to dismiss Plaintiffs' complaint in its entirety, while Plaintiffs' cross-motions for partial summary judgment seek closure with respect to the claims for breach of contract, bad faith, breach of fiduciary duty, violation of the Consumer Protection Act and Defendant's affirmative defenses.

III.    ANALYSIS

A.    *Summary judgment standard*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and

provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  *Anderson*, 477 U.S. at 248.  The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Plaintiffs moved for a Rule 56(f) continuance, in the event the Court was inclined, on the basis of the moving papers now before it, to grant Defendant's motion for summary judgment.

FED. R. CIV. P. 56(f) provides, in relevant part, that

[s]hould it appear from the affidavits of a party opposing [a summary judgment motion] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court . . . may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.

The Ninth Circuit has further clarified how this rule should operate: "To prevail under this Rule, parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (2004) (citing *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th

Cir. 1986).  In addition, "[t]he burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence exists, and that it would preclude summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

In the context of the present motions, the Court finds that Plaintiffs have defended against Defendant's motion for summary judgment as well as they can, and that the additional evidence sought to be discovered and produced would have no effect on the Court's findings in this order.  Therefore, Plaintiffs' motion for a Rule 56(f) continuance is DENIED.

Defendant's motion to strike Mr. Dwight Carter's declaration is STRICKEN as moot.  The Court does not rely on the contested portions or aspects of Mr. Carter's declaration.  Defendant's motion to strike Paragraph 2 of the Stolle Declaration is STRICKEN as moot.  The Court does not rely on this portion of the declaration in making findings of fact or conclusions of law.  Defendant's motion to strike "argument of counsel which contradicts the evidence submitted" is DENIED.

Plaintiffs' first surreply is STRICKEN as moot.  Plaintiffs' second surreply motion to strike is DENIED.  Many of the evidentiary arguments Plaintiffs make in their second surreply motion were already made and accepted by the Court without the benefit of the additional deposition testimony presented in the second surreply.  The additional evidence submitted in the second surreply, though pertinent, does not have any effect on the Court's conclusions of law.

In proceeding to the merits of the cross-motions for summary judgment, the Court will analyze certain of Plaintiffs' claims as they pertain to each policy and other claims in a more general fashion, as appropriate.

    B.    *840 application/801 policy claims*

        1.    *Breach of contract*

"Insurance policies are to be construed as contracts, and interpretation is a matter of law." *State*

*Farm Gen. Ins. Co. v. Emerson*, 687 P.2d 1139, 1141–42(Wash. 1984).  In construing the language of an insurance policy, a court must construe the entire contract together so as to give force and effect to each clause.  *Am. Star Ins. Co. v. Grice,* 854 P.2d 622, 625 (Wash. 1993).  If the language of an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists.  *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 881 P.2d 1020, 1025 (Wash. 1994).

In the case of the 840 application/801 policy, the parties dispute not only the terms of the actual policy applied for, but the applicability of the binding receipt.  As a preliminary matter, the parties agree that, generally speaking, "[a] bind[ing receipt] is a temporary insurance contract providing interim coverage from the date of application until the issuance of the formal policy."  *Orsi v. Aetna Ins. Co.*, 703 P.2d 1053, 1059 (Wash. Ct. App. 1985).  *See also* WASH. REV. CODE § 48.18.230(1).  "Prior to the issuance of a formal policy, the terms and conditions controlling the interpretation of the coverage afforded by a binder are those contained in the standard . . . insurance policy form."  *Orsi*, 703 P.2d at 1059.  However, since binders, as temporary contracts whose effective term is not normally expected to be longer than ninety days, *see* WASH. REV. CODE § 48.18.230(1), do not include all contract terms, they are subject to all the conditions of the contemplated policy.  703 P.2d at 1059.

The issue in the present case is not only what insurance is provided by the binding receipt, but whether the binding receipt had become a binding contract.  In the realm of insurance contracts, as for any other contract, "it is essential . . . that there be an offer or proposal by one party and an acceptance by the other."  *McGregor v. Inter-Ocean Ins. Co.*, 292 P.2d 1054, 1056 (Wash. 1956).  Here, Defendant conceded that "the binding receipt goes into play as soon as the applicant gives the check to the agent."  (Barnum Dep. 188:7–9.)  Defendant also concedes that "a binding receipt is essentially life insurance that is given without any regard to underwriting, or prior notice to the insurance company."  (Barnum Decl. ¶ 25.)  The

complicating factor in the present case is that Mr. Bryant was both the individual applying for insurance and the agent who received the application.

Defendant argues that because Mr. Bryant had a self-interest in the transaction or was otherwise acting beyond the scope of his agency, his receipt of his own application cannot be imputed to the company. In essence, Defendant's argument is that in order for the binding receipt to have taken effect, either an agent other than Mr. Bryant or the home office would have had to "receive" the application, and would have had to approve the issuance of the binding receipt.

### a.    Was Mr. Bryant acting beyond the scope of his agency?

There is no dispute that the general rule is that the knowledge and acts of the insurance agent are imputed to the insurance company. However, Defendant argues that because Mr. Bryant had issued the binding receipt in violation of Country Life's guidelines he was acting outside the scope of his agency, or in the alternative, because he was self-dealing, his "knowledge" of and otherwise regarding the application cannot be imputed to Country Life.

In support of its argument that Mr. Bryant was acting beyond the scope of his authority, Defendant cites to a document called an "Agent Manual." One Country Life employee testified at deposition that "[w]hen an agent is contracted . . . they are sent a new agent kit that has a full Country Life manual that's laying in front of you right at the moment." (Leckrone Dep. 550:14–22.) Another Country Life employee, Ms. Sally Smith, a senior life underwriter whose duties included training new life insurance agents, declared that "for the period throughout 2002 and 2003, agents and life underwriters for Country Life . . . were provided a soft-bound book with a green cover that is referred to as a Life Insurance Agent Manual." (Smith Decl. ¶ 3.) Attached to Ms. Smith's declaration is the "Underwriting" chapter from the manual she declares was in effect in 2002 and 2003.

The document attached to Ms. Smith's declaration contains an annotation at the bottom of every

page reflecting that it was updated in December 2000.  According to this manual ("December 2000

Manual), agents are instructed:

> NOTE: Do not bind coverage:
> - If the face amount of insurance applied for exceeds $500,000* on any Insured . . . .
> - If the Proposed Insured has had a life or health insurance application declined, postponed, or modified in amount, plan or rate . . . .
> - If, in your opinion, the Proposed Insured appears extremely overweight or unhealthy, or of poor character or reputation.
> - If you have any knowledge of adverse information regarding the Proposed Insured's present physical condition or past medical history which was not admitted at time of application.

(December 2000 Manual 4–6.)  The asterisk in the first bullet point was further elaborated: "The Binding

Receipt is for the amount applied for or $200,000, whichever is smaller."  (*Id.*)  Agents were also told that

"[i]f any recent 'serious condition' (#) is indicated on the application, the agent should not take money or

issue the binding receipt."  (*Id.* 4–7.)  This prohibitionary statement was followed by a long list of medical

conditions including "contemplated surgery or medical testing."  Although a number of the conditions

were preceded by "#," "contemplated surgery or medical testing" was not.  The "#" annotation was

explained by a note at the end of the list of conditions: "#Denotes a 'serious condition' — binding receipt

should not be given, no money to be taken."  (*Id.*)  Finally, the manual further exhorts agents that "[i]n

addition to these guidelines, it is expected that you, as the field underwriter, will use your own judgment in

binding coverage."  (*Id.* 4–7.)

Plaintiffs contend that the December 2000 Manual was not, in fact, the one in effect during Mr.

Bryant's employment with Country Life, and specifically was not the one in effect at the time of the 840

application.  During the course of discovery, Country Life produced a document appearing to be an

updated version of the Life Insurance Agent Manual provided by the company to its agents ("Passport

Manual").  This version contains a section titled "Obtaining, returning, or attaching money" that appears to

have been updated on July 12, 2002.  This section is followed by sections discussing when an agent should

bind coverage that roughly parallel, organizationally, the sections in the December 2000 Manual. The Court notes that in general, the layout and structure of the contents of the Passport Manual are very different from the Underwriting chapter in the December 2000 Manual.

Defendant's response to Plaintiffs' argument that the Passport Manual was in effect at the time of 804 application essentially concedes that Plaintiffs are correct as to the version of the manual in effect. (Def's Reply 8:9–18.)

The Passport Manual provides in relevant part:

Agents should exercise good judgment and are encouraged to call Underwriting before collecting premium in the following situations, if the proposed insured:
- Appears extremely overweight, unhealthy, or of poor character of reputation,
- Has had a life or health application declined, postponed, or modified in amount plan or rate,
- Has a present physical condition or past medical history, which was not admitted at the time of the application, but you have knowledge or adverse information.

(Stolle Decl. 24 (Passport Manual).) On the next page, the Passport Manual provides:

**Rules for when not to bind coverage**

Do not bind coverage when the following apply:

- The face amount of the insurance applied for exceeds $1,000,000 on any proposed insured, or exceeds $200,000 in Kansas,
- The proposed insured is:
  - Over age 65, or
  - A juvenile, and you did not see him/her at the time of the application
- Either or both questions on the binding receipt are answered "Yes."
- A substandard rate higher than table "F" is expected due to medical history and/or height/weight.

(*Id.* 25–26.)

Since Country Life concedes that the Passport Manual was the one in effect at the time of the disputed transaction, and since Country Life argues that the Life Insurance Agent Manual delineates the boundaries of its agents' agency, the Court finds that the Passport Manual and the guidelines therein define the scope of Mr. Bryant's agency. The Court also finds that the plain language of the Passport

Manual, generally speaking, permitted the issuance of a binding receipt in association with an application

such as the 840 application.  Mr. Bryant's imminent surgery, of which Country Life makes so much,

constituted a reason for which the Passport Manual "encouraged" agents to call Underwriting, but did not

require him to do so.  Country Life concedes that none of the prohibitionary issues listed under "Rules

when not to bind coverage" were present in the 840 application.  (*See* Def.'s Reply 8:15–23 (pointing out

only the occasions when agents were "encouraged" to call the home office).)  For these reasons, the Court

finds that Mr. Bryant was not acting outside the scope of his agency as defined by the Life Insurance

Agent Manual in force at the time the 840 application was filled out.

Despite this finding, Mr. Bryant may have been acting beyond the scope of his agency because of

his self-interest in the transaction.  Plaintiffs argue that an agent's self-dealing does not begin to have

ramifications with respect to the general rule that the principal is charged with the knowledge of its agent

until the self-dealing amounts to a situation in which "the agent is acting in a position that is adverse to his

principal and this generally means *the agent is committing actual fraud*."  (Pls.' Opp'n to Mot. for Summ.

J. 11 (emphasis in original).)  Plaintiffs are incorrect.  Although the cases cited by Defendant arguably all

involve cases of *actual* fraud, the rule applied by the courts does not require a showing of actual or

intentional fraud.  This is because

> [c]onsistent with the policy of preventing a broker or his subagents—without the informed
> consent of the principal—from intentionally or carelessly entangling the affairs of the
> principal with ties of the agent's kin, is the corollary rule that such dealings by a broker, or
> his subagents, without the required disclosure, amount to fraud in law. . . .It is of no
> consequence, in this regard, that the broker may be able to show that the breach of his duty
> of full disclosure and undivided loyalty did not involve intentional or deliberate fraud, or
> did not result in injury to the principal, or did not materially affect the principal's ultimate
> decision in the transaction.  The rule and the available remedies, instead, are designed as
> much to prevent fraud as to redress it.

*Mersky v. Multiple Listing Bureau of Olympia, Inc.*, 437 P.2d 897, 900 (Wash. 1968).  Courts universally

identify the harm associated with an agent's failure to inform its principal of any potential self-dealing not

as the possibility that the agent's action might result in actual monetary losses for the principal, but in the breach of the agent's duty of loyalty to the principal. *See Moon v. Phipps*, 411 P.2d 157, 161 (Wash. 1966) (stating "Loyalty is the chief virtue required of an agent. Failure to make a full disclosure of all facts within the agent's knowledge having to do with the transactions will warrant the court's setting the transaction aside at the behest of the principal.") Consequently, courts have imposed what amounts to a strict liability rule as to an agent's duty to obtain consent from the principal for any self-dealing transactions, regardless of whether the agent's self-interest results in actual detriment to the principal.

For this reason, it is not enough for Plaintiffs to show that Mr. Bryant committed no actual fraud — rather, they bear the burden of proving that Country Life not only had knowledge that he was simultaneously acting as agent and applicant on the 840 application, but had also consented to the transaction.

Plaintiffs' papers present the argument that Country Life had impliedly consented to the 840 application because it is a common practice for its agents to play a role in the issuance of policies on themselves, or in the alternative, because it had honored the 311 and 312 policies (with the exception of the disputed accidental death benefit under the 311 policy), for both of which Mr. Bryant had occupied the same dual role. However, Country Life's treatment of the 311 and 312 policies is not dispositive of the question regarding its obligations under the 840 application. Neither the 311 or 312 policies was issued as applied for. Rather, Country Life rated up the policies based on Mr. Bryant's history of asthma and his height/weight ratio. Thus, under a contract law analysis, Country Life's response to Mr. Bryant's applications for the 311 and 312 policies constituted counter-offers issued by the company. *See McGregor v. Inter-Ocean Ins. Co.*, 292 P.2d at 1056. The 311 and the 312 policies were the result of a counter-offer made by the company's underwriting department after receipt of the applications, *e.g.*, full disclosure of Mr. Bryant's dual role in the transaction, and manifested the company's knowledge of and assent to the

self-dealing.  In the alternative, the counter-offers could also be construed as negating the problem of a self-dealing agent, since the company's underwriting department, rather than Mr. Bryant, had formulated the offers.

An apparently more directly dispositive question would be how Country Life would have treated the binding receipts issued in both applications by Mr. Bryant to himself, or how Country Life treats the binding receipts issued by other agents for applications in which they are the applicants.  (*See* Darner Dep. 366–67, acknowledging that other Country Life agents have applied for and issued binding receipts on insurance policies for which they were the proposed insureds, but declining to elaborate on how those binding receipts are treated or whether they would be honored.)  However, even if Plaintiffs could establish that Country Life had routinely honored binding receipts on policies issued by its agents on themselves, Washington courts do not permit the use of a course of dealing to impose new obligations on a purported party to a contract.  *Badgett v. Security State Bank*, 807 P.2d 356, 361–62 (Wash. 1991).  *But cf. Nat'l Fire Ins. Co. of Hartford, Conn. v. Llewellyn*, 286 P. 792, 794 (Okla. 1930) (finding that where an insurance company had previously issued policies on the same property belonging to its agent, when the agent executed a new policy on her property and mailed a daily report containing disclosure of such policy to the company, the insurer was liable for the risk).  Thus, even an established pattern of accepting and honoring binding receipts such as the one in the 840 application could not by itself, under Washington law, obligate Country Life to honor the binding receipt associated with the 840 application.

However, the facts of this case as alleged by Plaintiffs suggest that Country Life may have done more than merely establish a pattern or practice of accepting applications from its agents on their own lives.  It may have expressly encouraged its agents to do so.  According to the Restatement, "*Unless otherwise agreed*, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge."  RESTATEMENT (SECOND) OF

AGENCY § 389 (1958) (emphasis added).  *See also Kieburtz & Assocs., Inc. v. Rehn*, 842 P.2d 985, 988

(accepting guidance of Restatement of Agency in the absence of express Washington case precedent).

Thus, according to the Restatement, a principal's express consent to a particular transaction is not

necessary where the parties have already reached an agreement.  In the present case, the record contains

evidence that Country Life was aware of the practice and had shaped policies acknowledging the practice

and regulating it.  (*See* Darner Dep. 367:11–21 (stating that agents could earn performance credits only

"up to a limit" on policies issued to themselves").)  Because there appears to be a very real possibility,

given that it regulated the practice, that Country Life had authorized its agents to submit and accept

applications for policies on themselves, the Court finds that there remains a genuine issue of material fact

as to whether Mr. Bryant, in handling the 840 application, was in fact self-dealing in an impermissible

fashion.  In other words, the Court finds that there is a genuine issue of material fact pertaining to the

possible existence of an agreement between Country Life and its agents permitting them to submit and

accept applications for policies (and, correspondingly, binding receipts) on their own lives.  Accordingly,

summary judgment is not appropriate as to the issue of whether the insurance contracts represented by the

801 policy and the binding receipt are void or voidable due to Mr. Bryant's dual role as agent-applicant.

> b.      *Was a contract formed as to the 801 policy or the binding receipt?*

If Plaintiffs are ultimately able to show that the 801 policy and the binding receipt are not void or

voidable due to Mr. Bryant's dual role as agent-applicant, Plaintiffs will have to show that contracts were

formed.  With respect to the 801 policy, even assuming without deciding that if the 801 policy is not void

or voidable due to Mr. Bryant's self-dealing, the application and the check are properly considered

received by the company[2], the record is sufficient to show that no contract had formed as to the putative

801 policy.  There is no genuine issue of material fact that the 801 policy, like the 311 and the 312

---

[2] This showing would be made as part of Plaintiffs' showing that Country Life had authorized its agents to submit and accept applications for policies on their own lives.

policies, would not have been issued as applied for.  (*See* Pls.' Reply (failing adequately to dispute Def.'s statement that "Country Life would not have accepted and issued a policy as applied for due to Mr. Bryant's health history").)  Therefore, the Court finds that the 801 policy is not a contract under which Country Life is obliged to make payments of benefits.

However, the contract formation analysis as to the binding receipt is different.  As Defendant itself explained, "the binding receipt goes into play as soon as the applicant gives the check to the agent." (Barnum Dep. 188:7–9.)  Thus, whether the binding receipt is effective does not depend on whether Mr. Bryant had fully informed Country Life of all material information.[3]  If Plaintiffs are able to show that Country Life had authorized its agents to submit and accept applications for policies on their own lives, Plaintiffs will also have shown that Mr. Bryant's possession of his own check could constitute the company's receipt of the check such that the binding receipt had taken effect.

c.    What insurance is provided under the binding receipt?

The binding receipt associated with the 840 application (*see* Samuelson Decl. Ex. N, at CLIC 091) provides for a death benefit of up to $200,000 during the application period.  The provisional insurance provided under the binding receipt would terminate only under three circumstances: (1) approval of the application, in which case the formal policy would kick in; (2) notification of disapproval of the application (either absolute disapproval, or through a counter-offer containing extra or different terms); or (3) after ninety days from the date listed on the receipt.  (*Id.*)  Defendant acknowledges that none of these three conditions occurred prior to Mr. Bryant's death.  (Barnum Dep. 190:9–23.)

Accordingly, if Plaintiffs are able to show that Country Life had authorized its agents to submit and accept applications for policies on their own lives, Plaintiffs will have shown that they may be entitled

---

[3] Mr. Bryant's affirmative obligation to disclose "full health particulars" is not excused by Country Life's authorization, if any, to its agents to submit and accept applications for policies on their own lives.  *Uslife Credit Life Ins. Co. v. McAfee*, 630 P.2d 450, 455-56 (Wash. Ct. App. 1981).  An agent's duty to disclose material information is independent of whether he or she is authorized to engage in self-dealing transactions.

to payment of the death benefit provided by the binding receipt.

2. *Bad faith*

a.      *Mrs. Bryant's standing to assert bad faith claims*

Defendant contends that Mrs. Bryant does not have standing to assert a claim of bad faith or violation of the Consumer Protection Act ("CPA") because she is a third-party claimant.  (Def.'s Mot. 20.) Defendant cites to *Tank v. State Farm Fire & Casualty Co.*, 715 P.2d 1133 (Wash. 1986), for support. However, the *Tank* Court expressly carved out an exception to the general rule as stated by Defendant thus:

> Our holding today is in apparent conflict with a recent Court of Appeals decision in *Gould v. Mutual Life Ins. Co.*, 63 P.2d 207 (1984).  But the result in *Gould* can be explained.  The *Gould* court held that a widow, as third party beneficiary under her husband's life insurance policy, could bring a CPA action against the insurer for wrongful refusal to pay a claim.  The court found that the widow was an intended beneficiary under the insurance contract.  As such, she was owed a direct contractual obligation by the insurance company and could sue to enforce the obligation.

715 P.2d at 1141.  Thus, *Tank* authorizes Mrs. Bryant, as the intended beneficiary under the 311 (Samuelson Decl. Ex. L) and 312 (*id*. Ex. J) policies, to assert bad faith and CPA claims.[4]  If the binding receipt associated with the 840 application is effective, Mrs. Bryant is also the intended beneficiary of the binding receipt and may sue thereunder.  (*See id.* Ex. N.)  *See Orsi*, 703 P.2d at 1059 (explaining that where a binding receipt does not itself expressly state a necessary provision, that provision is to be found in the putative formal policy).

b.      *Merits of claim*

The insurance bad faith cause of action arises out of the idea that "the business of insurance affects the public interest and that an insurer has a duty to act in good faith."  *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998).  "In order to establish bad faith, an insured is required to show the breach was

---

[4] Defendant is correct only in a general sense when it asserts that *Gould* was overturned by *Haberman v. Washington Public Power Supply System*, 744 P.2d 1032 (Wash. 1987).  In fact, *Haberman* only overturned that part of *Gould* pertaining to claims against attorneys under the CPA.

ORDER - 17

unreasonable, frivolous, or unfounded." *Id.* "Bad faith will not be found where a denial of coverage or a failure to provide a defense is based upon a reasonable interpretation of the insurance policy." *Id.*

The *Tank* Court explained an insurer's duty of good faith as follows:

The source [of the duty] is the fiduciary relationship existing between the insurer and insured. . . .This fiduciary relationship, as the basis of an insurer's duty of good faith . . . implies a broad obligation of fair dealing and a responsibility to give equal consideration to the insured's interests. Thus, an insurance company's duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests.

715 P.2d at 1136 (citations omitted) (emphasis in original).

Mrs. Bryant may assert a claim for bad faith claims handling even if it is ultimately determined that there is no insurance coverage. *Coventry Assocs. v. Am. States. Ins. Co.*, 961 P.2d 933, 937 (Wash. 1998). Thus, even though the Court has found that the putative 801 policy was not a contract, Mrs. Bryant may still assert a claim for a bad faith denial of coverage under the 801 policy. However, as she is not deemed a third party claimant, *see Tank*, 715 P.2d at 1141, she must establish the harm caused by the insurer's alleged bad faith. In addition, she is not entitled to coverage by estoppel, but rather to "consequential damages . . . as a result of the insurer's breach of its contractual and statutory obligations." *Coventry Assocs.*, 961 P.2d at 939.

"Whether an insurer acted in bad faith is a question of fact." *Am. States Ins. Co. v. Symes of Silverdale, Inc.*, 78 P.3d 1266, 1270 (Wash. 2003). The insurer is entitled to summary judgment on a bad faith claim only if "reasonable minds could not differ that its denial of coverage was based on reasonable grounds." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003).

Here, Defendant denied coverage under the binding receipt on the grounds that Mr. Bryant had impermissibly engaged in a self-dealing transaction and that in any case, the company would not have

permitted the issuance of a binding receipt had the home office been notified of his pending surgery.[5]

(Samuelson Decl. Ex. FF.)  Whether Country Life's assertion of these grounds was reasonable depends on

the extent to which it and its agents had been accustomed to the practice of submitting and accepting

applications for policies on their own lives and how it customarily treated notification of surgeries such as

Mr. Bryant's ethmoidectomy.  With respect to the latter, the Court notes that even under the guidelines

contained in the December 2000 Manual, Mr. Bryant's surgery would not have been considered a "serious

health condition" for which agents were instructed not to take money or issue binding receipts.  (Smith

Decl. 11.)

As the issue of the extent to which Country Life had established a custom of allowing or

authorizing its agents to submit and accept applications for policies on their own lives cannot be

determined on the basis of the record now before the Court, the Court finds that summary judgment is not

appropriate as to Plaintiffs' bad faith claims regarding the 840 binding receipt.  Likewise, the record is

insufficient for the Court to make any findings as to Defendant's customary treatment and consideration of

surgeries such as Mr. Bryant's ethmoidectomy.  Accordingly, this too is a genuine issue of material fact

remaining for trial.

With respect to Country Life's denial of coverage under the putative 801 policy, the essential

question is the same: whether reasonable minds could differ as to the reasonability of its denial of benefits.

The applicable facts here are somewhat different than in the case of the binding receipt.  Country Life

denied benefits under the 801 policy because no policy had been issued or delivered.  The terms of the

policy state quite clearly that "no insurance will take effect before the policy for such insurance is

---

[5] To the extent that Country Life intends to rely on its decision to "postpone" the 840 application due to the October 10 surgery as a "reasonable" basis for denying coverage under the binding receipt, the Court notes that not only has Defendant admitted that at the time it sent the letter notifying Mrs. Bryant of its decision to postpone, it already knew that Mr. Bryant had died (Barnum Dep. 262:23), it has also admitted that it sent the letter to "get off the risk" (*id.* 263:8).  Thus, should Country Life seek to rely on its decision to "postpone" the 840 application, it will have to show that that decision was itself based on reasonable grounds and therefore made in good faith (*i.e.*, giving the beneficiary's interests consideration equal to that given its own interests).

delivered and the first premium paid." (Samuelson Decl. Ex. N., at CLIC 090.) Even if Country Life's

handling of the application leaves something to be desired in the way of basic human compassion (*i.e.*, its

decision to send a letter to Mr. Bryant notifying him of its decision to postpone the application because of

his surgery, even though it was already aware that he was dead), there is no genuine issue of material fact

that the policy would not have been issued as applied for. Therefore, its conclusion that no contract for

insurance had been formed because no policy had been delivered would not have been materially affected

had the company chosen to proceed with the application as it had with the 311 and 312 policies.

Accordingly, to the extent that Plaintiffs assert a claim for bad faith denial of coverage as to the 801

policy, that claim is dismissed.

> C.     *311 policy claims*

>> 1.     *Breach of contract*

Country Life paid the $50,000 face amount of the 311 policy but denied coverage under the

accidental death benefit provision. This provision is as follows:

> We agree to pay an Accidental Death benefit upon receipt at our Home Office of due proof
> that the death of the Insured resulted, directly and independently of all other causes, from
> accidental bodily injury.
> . . . .

> [N]o benefit under this agreement will be payable for death resulting directly from . . .
> illness or disease including surgical or medical treatment therefore [*sic*].

(Samuelson Decl. Ex. L; Barnum Decl. 57)

Mrs. Bryant filed the claim for accidental death benefits on October 23, 2003. As noted above in

the "Background" section, her claim papers included the Yakima County coroner's death certificate,

stating that the immediate cause of death had been "cardiac dysrhythmia & cerebral edema (brain dead)."

(Samuelson Decl. Ex. Y, at CLIC 112.) The certificate did not attribute the physiological causes of death

to any other underlying cause (*i.e.*, injury). Country Life also obtained Mr. Bryant's medical records from

immediately prior to his death (including Dr. Schefter's pre-operative exam sheet).

Ms. Kim Cordts, a Country Life life claims examiner, determined that the cause of Mr. Bryant's death was "natural" rather than accidental.  (Samuelson Decl. Ex. AA (e-mail from Ms. Cordts to Mr. Siron to this effect); Cordts Dep. 62:21–22 (stating that she made the determination when she processed the claim).)  Ms. Cordts conceded that she did not know whether either of the causes of death as listed on the certificate could themselves have been the result of an accident.  (Cordts Dep. 63:11–64:16.)  Ms. Cordts also testified that in addition to the information from the death certificate, she had information from a co-worker, Ms. Tonya Anderson who had discussed the fact that "[Mr. Bryant] had went in for a procedure, and went home from the procedure, and then was admitted to the hospital, and he had an infection that resulted in his death."  (*Id*. 66:11–15.)  However, she did not know what the infection was or how it was caused.  (*Id*. 65:18–66:19.)

Defendant contends that no benefits under the accidental death provision are due because Mr. Bryant's death resulted from an illness or disease including surgical or medical treatment.

"The court examines the terms of an insurance contract to determine whether under the plain meaning of the contract there is coverage."  *Kitsap County v. Allstate Ins. Co.*, 964 P.2d 1173, 1178 (Wash. 1998).

> Whether coverage exists is a two-step process.  First, the insured must prove that the policy covers his loss.  Thereafter, to avoid coverage the insurer must prove that specific policy language excludes the insured's loss.  Ultimately, we determine coverage by characterizing the perils contributing to the loss, and determining which perils the policy covers and which it excludes.

*Truck Ins. Exch. V. BRE Props., Inc.*, 81 P.3d 929, 932 (Wash. Ct. App. 2003) (citations omitted).

Under this analytical framework, it is Plaintiffs' burden to show that Mr. Bryant's death was an "accidental death" as defined by the 311 policy, *e.g.*, not a death resulting directly from illness or disease including surgical or medical treatment therefore.  Plaintiffs argue that because Mr. Bryant's surgery did

not relate to an illness or disease, but a "chronic physical sinus condition," his death, even though connected to the surgery (but for the surgery, he would not have contracted the meningitis), was not connected to a surgery relating to an illness or disease. It is not necessary for the Court to determine the merits of Plaintiffs' argument.

In a case directly on point, *Zinn v. Equitable Life Ins. Co. of Iowa*, the Washington Supreme Court considered whether insurance policies virtually identical to the one in the present case provided an accidental death benefit where the insured had died of a staphylococcus infection contracted after a doctor had drawn some blood from his arm. 107 P.2d 921, 922 (Wash. 1940). The rule articulated by the *Zinn* Court was as follows: "[D]eath is accidental, within the meaning of the provisions of insurance policies such as we have in the case at bar where death occurs as the result of unusual, unexpected or unforeseen events following an intentional act, provided that those events are not normally effected." *Id.* at 927. The *Zinn* Court found that the insured's death was attributable to the bacteria, rather than the intentional surgical procedure, and thus escaped the rule stated in *Johnson v. Business Men's Assurance Co. of America*, 228 P.2d 760, 762 (Wash. 1951), that "accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death." *See Safeco Ins. Co. of Am. v. Dotts*, 685 P.2d 632, 635 (Wash. Ct. App. 1984) (finding that *Zinn* is undisturbed by *Johnson*).

The present case is functionally identical to *Zinn*, in that (1) the record now before the Court establishes that Mr. Bryant died of an infection (early acute meningitis and sepsis) (Marisseau Decl. 18); (2) Defendant claims that the cause of death was *not* the surgery (Def.'s Resp. to Pls.' Mots. 16:21–26); and (3) the accidental death provisions of the 311 policy contain the same key elements as the policies in *Zinn*.[6] Accordingly, *Zinn*'s holding controls the result of the Court's analysis here and requires that

---

[6] The *Zinn* policies required that death result "directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means" provided that such death did not occur "as a result directly or indirectly of

summary judgment be granted in favor of Plaintiffs.

           2.    *Bad faith denial of coverage*

       Plaintiffs claim that Country Life denied coverage under the accidental death benefit provision of the 311 policy in bad faith.  The analytical framework for a bad faith claim was laid out *supra*, in the Court's discussion of the 840 application/801 policy and the binding receipt thereto.  As noted before, Plaintiffs may assert a claim for bad faith claims handling regardless of the merits of the coverage decision.

       Plaintiffs contend that Country Life failed to conduct a reasonable investigation of the claim before refusing payment because Ms. Cordts made her denial based upon (1) Ms. Anderson's remarks indicating that Mr. Bryant had died of an infection, and (2) the death certificate listing two causes of death as to which Ms. Cordts conceded she did not know whether they could have resulted from an accident.  As with the 840 application/801 policy, the question that the Court must answer is whether reasonable minds could differ as to the reasonability of its denial of benefits.

       Defendant does not dispute that it made its decision based on the above two facts, choosing instead to rest on its argument that its coverage decision was correct.  However, whether the coverage decision is correct (forgetting, for the moment, that the Court has found that the coverage decision was *not* correct) is not dispositive of the bad faith claim.  *Coventry Assocs.*, 961 P.2d at 937.  Instead, the claim is that Defendant failed to conduct a reasonable *investigation* of Mrs. Bryant's claim under the accidental death provision.

       The Court finds that reasonable minds could not differ as to a finding that Ms. Cordts's incuriousness and her failure to inquire further into the cause of Mr. Bryant's death constituted a failure to conduct a reasonable investigation of the claim.  Ms. Cordts's conduct in failing to investigate further does

---

disease in any form."  107 P.2d at 922.  The policy here contained the same requirements, namely death resulting "directly and independently of all other causes, from accidental bodily injury" (Barnum Decl. 57), provided that such death did not occur directly from "illness or disease including surgical or medical treatment therefore [*sic*]" (*id.*).

not demonstrate that she or Country Life gave equal consideration to the Bryants' interests, as is required by *Tank*. 715 P.2d at 1136. Because Defendant does not dispute the limited extent of its investigation into the nature of Mr. Bryant's death, the Court finds that Plaintiffs have shown that there is no genuine issue of material fact remaining for trial as to their claim for bad faith denial of coverage on the 311 policy. Accordingly, Plaintiffs' motion for summary judgment is granted as to this claim.

      D.    *Misrepresentation claims*

Plaintiffs allege that Defendant committed actionable misrepresentation when it stated (1) that a claim file had been established regarding the 840 application; and (2) certain "pertinent facts concerning Jeffrey Bryant's duties to Country Life." The purported basis for Plaintiffs' misrepresentation claims appears to be a combination of WASH. ADMIN. CODE 284-30-330, which provides that insurance companies may not "[m]isrepresent[] pertinent facts or insurance policy provisions," and the misrepresentation tort cause of action.

With respect to the first alleged misrepresentation, Plaintiffs' claim must fail. The record demonstrates that a claim file *was* established and that an investigation did take place. (Darner Decl. 14 (reflecting that Mr. Darner had requested that the Yakima office send him the original application materials for the 840 application) and ¶¶ 14–16 (listing some of the investigatory steps taken by Mr. Darner).) Therefore, as there is no genuine issue of material fact that Defendant's statement that a claim file had been established was actually true, Plaintiffs' claim must fail as to this alleged misrepresentation.

Plaintiffs' claim as to the second alleged misrepresentation (regarding Mr. Bryant's duties to Country Life) must also fail. Country Life's statements, or rather, *arguments* about Mr. Bryant's duties as an agent are neither "facts" nor statements about insurance policy provisions. As such, they cannot trigger liability under WASH. ADMIN. CODE 284-30-330.

Finally, Plaintiffs allege one more misrepresentation: Country Life's October 21, 2003 letter

stating that "[a]t this time, we are unable to provide the insurance protection you have requested because surgery needs to be completed and released [*sic*] from doctor's care."  Unlike in Plaintiffs' other two allegations, this statement *does* fit into the category of "pertinent fact."  Defendant admits that at the time this letter was sent, it already knew that Mr. Bryant was dead.  It also admitted that the letter was sent despite this knowledge in order to "get off the risk."  Finally, Mr. Barnum, Chief Underwriter, stated in his declaration that "Most importantly, life insurance can not [*sic*] be issued to people who have already died." (Barnum Decl. ¶ 31.)  In light of these admissions as to why the application had been postponed, the Court finds that Plaintiffs have shown that there is no genuine issue of material fact regarding the falsity of Country Life's October 21 representation that the application had been postponed due to the surgery.

Establishing that a misrepresentation was made is only the first step.  Washington courts have adopted the Restatement (Second) of Torts definition of the negligent misrepresentation cause of action. *Schaaf v. Highfield*, 896 P.2d 665, 668 (Wash. 1995).  This definition provides a cause of action against "[o]ne who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions." RESTATEMENT (SECOND) OF TORTS § 552 (1977) (as cited in *Transamerica Title Ins. Co. v. Johnson*, 693 P.2d 697, 701 (Wash. 1985)).  A necessary element in a negligent misrepresentation claim is a showing that the plaintiff's reliance on the misrepresentation caused it harm.  *Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 447 (Wash. 1994).  Claims for intentional misrepresentation also require that damages be shown.  *Stiley v. Block*, 925 P.2d 194, 204 (Wash. 1996).

Here, Mrs. Bryant claims that the harm suffered was that "she did not submit a formal claim under the Binding Receipt until her counsel's demand letter of December 17, 2003.  (Pls.' Opp'n 21–22.)  It is not clear from this bald assertion how this delay constitutes actionable harm.  Because this assertion raises a genuine issue of material fact as to whether Defendant's misrepresentation of what was going to happen

or what was happening with the 840 application caused actionable harm, summary judgment as to this aspect of Plaintiffs' misrepresentation claim is not appropriate. Accordingly, the parties' motions for summary judgment are denied as to Plaintiffs' misrepresentation claim as it pertains to Country Life's October 21, 2003 letter.

Although the Court finds that there remain genuine issues of material fact as to the harm suffered precluding any final rulings on the misrepresentation claims, the Court finds that questions regarding Plaintiffs' reliance on the statement are suitable for determination on summary judgment. Both intentional and negligent misrepresentation claims require a showing that a plaintiff had a right to rely on the misrepresentation. *Stiley*, 925 P.2d at 204 (stating elements of intentional misrepresentation claim); *Havens*, 876 P.2d at 447 (stating elements of negligent misrepresentation claim). For both types of misrepresentation claims, a plaintiff must show by clear, cogent, and convincing proof that she justifiably relied on the misrepresentation. 925 P.2d at 204; 876 P.2d at 447. Here, there is no genuine issue of material fact that Mrs. Bryant relied on the misrepresentation or that her reliance was justifiable. Defendant does not contend otherwise, though it challenges whether such reliance was detrimental. Accordingly, the Court finds that Plaintiffs have established, as a matter of law, that Mrs. Bryant justifiably relied on Country Life's October 21, 2003 letter.

The Court also finds that Plaintiffs have established, as a matter of law, that Country Life knew its October 21, 2003 letter was false and that it intended that falsity to affect Mrs. Bryant's course of action. (*See* Barnum Dep. 263:20–264:9 (stating that the letter had been sent to "get off the risk").)

E.   *Washington Consumer Protection Act claims*

Plaintiffs' CPA claims stem from their insurance bad faith and misrepresentation claims. The Court found, with respect to Plaintiffs' bad faith claims, that (1) Plaintiffs are entitled to summary judgment on their bad faith claim as to the 311 policy, (2) Defendant is entitled to summary judgment

dismissing the bad faith claim as to the putative 801 policy, and (3) summary judgment was not appropriate as to the bad faith claim regarding the binding receipt.  As to Plaintiffs' misrepresentation claims, the Court (1) granted Defendant's summary judgment motion as to the statements that a claim file had been established and Mr. Bryant's duties, and (2) found a genuine issue of material fact remained for resolution as to the harm suffered by Plaintiffs as a result of their reliance on Defendant's October 21, 2003 letter regarding postponement of the 840 application.

Accordingly, the CPA claims remaining pertain to: (1) bad faith handling of the accidental death claim under the 311 policy, (2) alleged bad faith handling as to the binding receipt, (3) and the October 21, 2003 misrepresentation of what was happening with the 840 application.

*Industrial Indemnity Co. of the Northwest v. Kallevig* authorizes CPA actions "based upon a violation of RCW 48.30.010 resulting from a single violation of WAC 284-30-330." 792 P.2d 520, 530 (Wash. 1990).  WASH. ADMIN. CODE 284-30-330 prohibits misrepresentations, as discussed above, and refusals to pay claims without conducting a reasonable investigation.  "A Consumer Protection Act in the insurance context requires (1) an unfair or deceptive practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act." *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000) (citing *Kallevig*, 792 P.2d at 528).  *Kallevig* held that violations of WAC 284-30-330 constitute *per se* unfair trade practices, satisfying the first prong of the five-prong CPA analysis.  792 P.2d at 529.  Here, because Plaintiffs have prevailed on their bad faith claim regarding the accidental death benefit under the 311 policy, Plaintiffs have also established the first prong of their CPA claim as to the 311 policy.  Should Plaintiffs prevail on their bad faith claim as to the binding receipt and their remaining misrepresentation claim, they will have established the first prong of the CPA claim as to those allegations as well.

The second prong of Plaintiffs' CPA claims is established as a matter of law since the subject matter of this action involves insurance contracts, a commercial transaction. The third prong is also established as a matter of law, since CPA claims "alleging unfair insurance claims practices meet the public interest element because RCW 48.01.030 declares that the business of insurance is one affected by the public interest." *Anderson*, 2 P.3d at 1033 (quotation marks omitted).

However, as to the last two prongs, injury (meaning injury to business or property), and causation, Plaintiffs have not made a sufficient showing to warrant summary judgment as to the single violation established by their summary judgment motion (the bad faith handling of the accidental death benefit). Genuine issues of material fact remain as to the existence and extent of the damages suffered and the causal link between Defendant's CPA violation and those damages.

As Plaintiffs' CPA claim regarding the binding receipt depends on whether they prevail on the underlying bad faith claim, it would be premature for the Court to reach the question of damages associated with this claim.

Finally, as to the CPA claim regarding misrepresentation, the Court's finding that the October 21, 2003 letter constituted a misrepresentation of a pertinent fact establishes the first prong of the associated CPA claim as a matter of law. 792 P.2d at 529. The second and third prongs are also established as a matter of law, as discussed above. However, as was the case with Plaintiffs' underlying misrepresentation claims and their CPA claim on the accidental death benefit, the record is not sufficient to allow the Court to make findings as to the existence and extent of damages, and the required causal link between the misrepresentation and those damages.

F.    *Breach of fiduciary duty*

Plaintiff purports to state a claim for breach of fiduciary duty. While such a cause of action may exist outside of an insured's allegations of bad faith claims handling, it does not exist here. In the present

case, Plaintiffs' claims for breach of fiduciary duty are merely its bad faith claims under another name. *See Van Noy v. State Farm Mut. Auto. Ins. Co.*, 16 P.3d 574, 579 n.2 (Wash. 2001) (stating "we have long held that the duty of the insurer to act in good faith toward the insured is the same as the fiduciary relationship that the insurer has to the insured") (citing *Tank*, 715 P.2d at 1136). Accordingly, the Court dismisses Plaintiffs' claims for breach of fiduciary duty.

### G. Declaratory relief

Defendant moves to dismiss Plaintiffs' claim for declaratory relief. In support of its one-sentence motion, Defendant cites to a case, *Grange Insurance Association v. Ochoa*, that does not support its motion. 691 P.2d 248, 251 (Wash. Ct. App. 1984). The *Grange* Court remarked on the limited scope of an action for declaratory judgment on insurance coverage, noting that such an action does not permit a court to resolve underlying issues as to negligence. *Id.* at 251–52. This remark is irrelevant to this case, where the lawsuit consists of several different claims, one of which is a claim for declaratory relief, and others of which seek to impose liability for negligence and other things. In other words, Plaintiffs do not seek to shoehorn their negligence claims into an insurer's declaratory judgment action. Therefore, the Court finds that Defendant has failed to sustain its summary judgment burden of showing that it is entitled to judgment as a matter of law as to Plaintiffs' claim for declaratory relief. Accordingly, Defendant's motion is denied as to this claim.

### H. Claims for infliction of emotional distress

Plaintiffs' complaint alleges that "Defendant's wrongful conduct" and its sending of the October 21, 2003 letter constitute negligent and/or intentional infliction of emotional distress.

#### 1. Negligent infliction of emotional distress

"In order to recover for negligent infliction of emotional distress, a plaintiff's emotional response must be reasonable under the circumstances, and be corroborated by objective symptomology." *Hegel v.*

*McMahon*, 960 P.2d 424, 430 (Wash. 1998). *Hegel* requires that "to satisfy the objective symptomology requirement . . . , a plaintiff's emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Id.* at 431. Here, Defendant contends that Mrs. Bryant, though perhaps upset, did not suffer consequences amounting to objective symptomology. Plaintiffs' opposition to the motion consists largely of Mr. Stolle's observations of Mrs. Bryant at her deposition, and Mrs. Bryant's testimony that she felt "sickened" by the letter. (Pls.' Opp'n 23.) Neither of these proffers satisfies *Hegel*'s requirement that the distress be proved through medical evidence. Plaintiffs have not even alluded to any medical evidence which might raise a genuine issue of material fact as to whether Plaintiffs can establish the requisite degree of distress. Because this distress is the necessary fourth prong (injury or damage) of a claim for negligent infliction of emotional distress, and because Plaintiffs have not shown that there is any genuine issue of material fact, Defendant's motion must be granted as to this claim.

### 2. *Intentional infliction of emotional distress*

To establish a claim for the tort of outrage, a plaintiff must show "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff." *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1998). What constitutes "extreme and outrageous conduct" was further defined by the supreme court in *Dicomes v. Washington*, which held that "the conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 782 P.2d 1002, 1012 (Wash. 1989) (citing *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975) (emphasis omitted)). While the question of outrageousness is normally one for the jury to decide, it is for the court to make the initial determination of whether "reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Id.* Conduct which is merely insulting or annoying, or even threatening will not trigger liability. *Grimsby*, 530 P.2d at 295.

Here, Plaintiffs have failed to allege conduct meeting the *Dicomes* standard. While Defendant's conduct lacked in compassion and may have demonstrated an actionable degree of self-interest, the Court finds that reasonable minds could not differ on the finding that the accused conduct does not amount to conduct "beyond all possible bounds of decency" or "atrocious" conduct. 782 P.2d at 1012.

Accordingly, Defendant's motion is granted as to Plaintiffs' claim for intentional infliction of emotional distress.

I.       *Defendant's affirmative defenses*

1.       *Mr. Bryant's duty to disclose all health information*

Mr. Bryant's duty to disclose all health information would only be relevant to the issue of coverage under the putative 801 policy. Since the Court has found that no contract was formed as to the 801 policy, this affirmative defense is now moot and shall be stricken.[7]

2.       *Mr. Bryant's fiduciary duty*

Defendant asserts that Mr. Bryant breached his fiduciary duties to Country Life to act with the utmost degree of good faith to Country Life as his principal. Since the Court found that there remains a genuine issue of material fact as to whether Mr. Bryant acted beyond the scope of his agency because of his self-interest in the transaction, summary judgment as to this defense is not appropriate at this time.

3.       *Mr. Bryant's self-dealing and issuance of binding receipt*

Defendant's answer states "Mr. Bryant was engaged in self-dealing and breached duties owed to Country Life by issuing the 'Binding Receipt' to himself without authority from Country Life." (Answer 8.) With respect to the latter, the Court has found as a matter of law that Mr. Bryant did not act beyond the scope of his authority as defined in the Passport Manual applicable at the time he completed the 840 application. However, to the extent that this affirmative defense presents the same issue of law as the

---

[7] The Court has already explained that "whether the binding receipt is effective does not depend on whether Mr. Bryant had fully informed Country Life of all material information" because the provisions of the binding receipt are triggered as soon as the check is given to the agent.

question of whether Mr. Bryant acted beyond the scope of his agency because of his self-interest in the transaction (if Country Life had not consented thereto), summary judgment as to the defense is not appropriate at this time.

### 4.    Scope of Mr. Bryant's authority

The Court found as a matter of law that Mr. Bryant had not exceeded the scope of his authority as that authority was defined in the Passport Manual.  However, to the extent that this affirmative defense presents the same issue of law as the question of whether Mr. Bryant acted beyond the scope of his authority or agency because of his self-interest in the transaction (if Country Life had not consented thereto), summary judgment as to the defense is not appropriate at this time.

### 5.    Unclean hands, fraud and bad faith

To the extent that these defenses are intertwined with the question of whether Mr. Bryant acted beyond the scope of his authority or agency because of his self-interest in the transaction, summary judgment as to the defense is not appropriate at this time.

### 6.    Mr. Bryant's intent to form a contract

The Court found that no contract had formed as to the putative 801 policy.  Therefore, insofar as this affirmative defense is addressed to the 801 policy, the defense is now moot and shall therefore be stricken.  However, as Mr. Bryant's intent to submit his application is relevant and material as to whether he had submitted his check to himself and thus material to whether the binding receipt had taken effect, summary judgment as to this defense is not appropriate at this time.

### 7.    Lack of consideration and acceptance as to the binding receipt

Defendant itself has acknowledged that "the binding receipt goes into play as soon as the applicant gives the check to the agent." (Barnum Dep. 188:7–9.)  Defendant also acknowledged that the check need not be received by the home office or deposited before insurance coverage would be provided under the

terms of the binding receipt.  Thus, to the extent that Defendant's assertion is that the binding receipt associated with the 840 application requires the same consideration as what is necessary to form a contract on a formal policy, the defense is dismissed as having no factual or legal basis in the documents submitted to the Court.

To the extent that the "acceptance" portion of the asserted defense is intertwined with the question of Mr. Bryant's intent to form a contract, summary judgment as to this defense is not appropriate at this time.

### 8.    *Binding receipt and 801 policy are void or voidable and unenforceable*

The Court has already found that no contract was formed as to the 801 policy.  Therefore, insofar as this affirmative defense is addressed to the 801 policy, the defense is now moot and shall therefore be stricken.  However, as the Court has found that there remains a genuine issue of fact as to the question of whether Mr. Bryant acted beyond the scope of his authority or agency because of his self-interest in the transaction, summary judgment on the defense as it relates to the binding receipt is not appropriate at this time.

### 9.    *Mrs. Bryant's standing*

The Court has found as a matter of law that Mrs. Bryant has standing, in her personal capacity, to assert bad faith and CPA claims.  Therefore, this affirmative defense is dismissed as to the bad faith and CPA claims.  The defense is stricken as moot with respect to the breach of fiduciary duty claims.

### 10.    *Country Life has made all payments due to Plaintiffs*

The Court found that Country Life breached its contractual obligations under the accidental death provision of the 311 policy and that it denied this claim in bad faith.  Therefore, as a matter of law, Country Life has not made all payments due to Plaintiffs.  In addition, until the matter of Defendant's obligation under the binding receipt is resolved, there remain genuine issues of material fact as to whether

Defendant has further obligations to Plaintiffs under the binding receipt.

11.   *Waiver, estoppel, and cause of Mr. Bryant's death*

Defendant fails to defend its assertion of the affirmative defense of waiver. Therefore, the Court dismisses this defense.

The Court found that the record now before the Court established as a matter of law, for the purposes of this lawsuit, that Mr. Bryant's death was caused by his meningitis infection and sepsis. As Defendant contends that its affirmative defense of estoppel is addressed only to Plaintiffs' claims regarding the cause of Mr. Bryant's death, the defense is now moot and shall therefore be stricken. In addition, Defendant asserts as an affirmative defense that "Mr. Bryant's death resulted directly from illness or disease including surgical or medical treatment therefore." The Court's finding as to Mr. Bryant's cause of death, cited above, effectively disposes of this affirmative defense. Plaintiffs' motion for summary judgment is granted as to this defense.

12.   *Liquidation of Plaintiffs' damages*

Defendant asserts that Plaintiffs' claims are not liquidated and that Plaintiff is not entitled to pre-judgment interest. Under Washington law, a claim is liquidated if the amount due can be computed with exactness and without reliance on opinion or discretion. *Prier v. Refrigeration Eng'g Co.*, 442 P.2d 621 (1968). Where a case has involved both liquidated and unliquidated claims, the courts have awarded pre-judgment interest on the liquidated amounts. *See, e.g., Aker Verdal A/S v. Neil F. Lampson, Inc.*, 828 P.2d 610, 617–18 (Wash. Ct. App. 1992). Here, Plaintiffs' damages as to the amount of the accidental death benefit under the 311 policy ($50,000) and on the binding receipt ($200,000 if coverage is due) are considered liquidated. Because the Court granted Plaintiffs' summary judgment motion on the accidental death benefit, Plaintiffs are now entitled at least to pre-judgment interest on the $50,000 due.

Although the Court has found that Plaintiffs are entitled to pre-judgment interest on some of the amounts due, as Plaintiffs' entitlement to damages on other remaining claims has not yet been determined, dismissal of this defense is inappropriate at this time.

        *13.    Punitive damages*

Summary judgment on this affirmative defense is not appropriate at this time.  Plaintiffs' ability to recover treble damages under the CPA has yet to be determined and therefore constitutes a genuine issue of material fact precluding dismissal of this defense.

IV.     CONCLUSION

In accordance with the foregoing, Plaintiffs' motions for summary judgment are GRANTED in part and DENIED in part, and Defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiffs are DIRECTED to SHOW CAUSE why the estate's bad faith and CPA claims should not be dismissed for lack of standing, in light of the fact that the estate is not a beneficiary of the insurance policies at issue.


SO ORDERED this 2nd day of February, 2006.


                                   _____

                                   UNITED STATES DISTRICT JUDGE

ORDER - 35